case number 17-1251 et al. Entergy Services, Inc. Petitioner v. Federal Energy Regulatory Commission. Mr. Weisberg is now on mute. Good morning. Good morning. Can you hear me okay, Judge Stahel? Yeah, we can hear you. Go ahead. Thank you. May it please the court, Sanford Weisberg for Petitioner, Entergy Services and 17-1251. I'd like to discuss the principal liability issue that's before the court today, which is whether Entergy Arkansas was allocated the right energy to serve the opportunity sales, which were made between 2000 and 2009. Now, the way Entergy Arkansas and Entergy Services did this originally was to use Entergy Arkansas's own plants, which tended to be lower cost. FERC ruled, however, that Entergy was required to use the highest cost sources on the system to serve these opportunity sales. Now, that issue of liability turns in particular on the meaning of the word loads in Section 30.03a of the Entergy System Agreement, and I'd like to begin with that word and that provision. Now, our argument today is that FERC erred as a matter of plain text and the structure of the Entergy System Agreement in ruling that loads does not include the opportunity sales. Again, Entergy's position is that loads does include the opportunity sales, and therefore, they should have been allocated the low-cost energy from Entergy Arkansas. Now, the meaning of the word loads, I think it's helpful to start with FERC's own decision, and I'd direct the court's attention respectfully to... I do want to hear your argument about why you think this is unambiguous, but if we agree with FERC that it's ambiguous, that the tariff's ambiguous, since there are only two options, it's either under 30.03 or 30.04, then FERC wins, right? In other words, your argument depends completely on convincing us that the tariff's correct, because if it's ambiguous, you can't prevail, right? We wouldn't entirely agree with that statement because we do present an argument under step two. The analysis here is akin to the Chevron analysis the court is familiar with. We do present an argument as well at step two, and in particular, at step two, we focused on the absurdity of FERC's interpretation, and I skipped a little step here, which is that FERC initially and finally did rule that Energy Arkansas was allowed to make the opportunity sales, and yet in the same breath, a few pages later in opinion 521, FERC said, we're going to allocate the costs such that all the witnesses for all the parties in the proceeding agreed, these sales would almost always lose money, and so FERC is... For me, you're the beast, right? I mean, if FERC's right that the opportunity sales has to be classified under 30.04, then Energy Arkansas has to bear its own costs. Those sales won't be profitable. Why is that absurd? Well, the reason is because the sales were so unlikely to be profitable that it wouldn't even make sense to allow them in that event, and I do want to stress, Judge Hatel, that this is a step two argument that we're making. It's not our step one argument. I just want to cabin the argument so that I understand it, but if I weren't... If the court was unpersuaded by the point you just made about absurdity, then do you agree with me that if we the tariff is ambiguous, that that means by definition that FERC prevails, right? Usually, the agency does prevail if there's ambiguity. I would recognize that. Not always, but usually. How about this case? In this case, well, in addition to the absurdity point, which let's set that aside, the other arguments that we've made about the plain language, which I'd like to get into in a unambiguity in favor of Entergy, we do think that they, in balance, help to show why FERC's decision was unreasonable, but among other reasons, and I'd like to get to 30.03, but I want to answer Your Honor's question. Okay, you go ahead and make your plain language. Thank you, Your Honor. So I'd like to start with FERC's own decision, page 1401 of the joint appendix. FERC recognized that the word loads is defined by the industry to be generic and inclusive. One of LPSC's witnesses, that's the Louisiana Commission, at 429 of the appendix stated that system dispatcher has to meet all of the loads that it faces, and those would be meeting native load, meeting off-system sales, and opportunity sales. So there is a statement from LPSC's own witness that loads is an inclusive term that includes opportunity sales. But even beyond the plain meaning of the word loads and the definition given by the industry, I think the most important thing I can point the court to this morning is the contrast between 30.13 and 30.03a. Now, these provisions are both part of the key service schedule in the Entergy System Agreement, which is MSS3, and there's a clear contrast in that in 30.03a, the word loads is unadorned. There's no carve-out. There's no exception. It's just looking at 30.03a, which is the key provision, and I'm about to contrast that with 30.13. What were you contrasting it with? With 30.13. Yes, that's the most important contrast that I have to draw this morning. Because again, in 30.03a, loads is in the plural. It's not subject to any carve-out or adjective or if we look at 30.13, and FERC interpreted this very provision in our case in opinion 521 at page 1397 of the appendix, FERC said that 30.13 is narrower because it carves out opportunity sales. It carves out the very thing that's at issue. So we've got a carve-out in 30.13 of opportunity inference in such a situation that that was intentional, that the broad use of the unmodified term loads in 30.03a was intentional. To put it in FERC's own words at 1397, FERC said that 30.13 excludes opportunity sales, whereas 30.03a allocates based on total load. That's a direct quote, total load. It's interesting that FERC said this in the portion of its decision, which was about whether Entergy Arkansas was permitted to make the opportunity sales. A few pages later, when FERC turns to the separate issue of allocating costs, FERC sort of forgets about that. And then all of a sudden, it comes to a much narrower interpretation of loads in 30.03a. So that's a very important contrast. There's another contrast though, if the court wants an additional example, which is 70.06 of the system agreement. Again, that uses the term loads, specifically net area loads, and then it carves out from that off-system sales. Now, an opportunity sale is one example of an off-system sale. So in 70.06, we have loads minus off-system sales. In 30.03a, all we have is loads, period. And those are important contrasts that should be considered as a matter of the plain text and structure here. Now, FERC didn't really confront those contrasts. To be fair, FERC did address it in Opinion 521a, the decision on rehearing, but really in just a sentence, this issue of 30.13 versus 30.03a. In terms of the definition, FERC didn't identify another alternate reasonable definition in Opinion 521. It acknowledged that this is an inclusive definition, and then it said, well, loads and requirements are used in different ways in the system agreement. We think it's ambiguous. But as we explained in our reply brief, really, FERC's only examples are of the word requirements and not loads. We think that as a matter of loads, that the meaning is clear. So what did FERC do? Joyce, I have a question about the fact that requirement sales are included within loads, generally, under this contract, right? I mean, what is the difference between requirement sales and opportunity sales? I mean, they're obviously both to others. I guess, how are they different for purposes of thinking about loads in the industry? So, Judge Rao, we think that the word loads cannot distinguish between those two types. And your Honor is right. Everyone in this case agrees that requirement sales, which is one species of wholesale sales, they generally tend to be longer term, a year or more, as opposed to opportunity sales, which can be a month long. They are within loads. And the only dispute here is whether opportunity sales are also within loads. We don't think the definition or the text of that word, or in particular, the contrast with 30.13 supports any sort of distinction between requirements and opportunity sales. They're either both in loads or they're both not in loads. And we think that they both are in loads. Now, when FERC said that there was ambiguity in 30.03a, FERC instead decided to turn to 30.04. And we don't think the court needs to get to 30.04, but I'd like to point out some problems that are created by FERC's interpretation. And so, FERC basically said, these opportunity sales are within 30.04, and therefore, they're going to be allocated the highest cost energy on the system. The immediate problem with that is that 30.04 has this concept in it of reimbursement. So, that is the selling company, which in this case was Energy Arkansas, under FERC's view, has to reimburse another energy company that's providing the energy. However, FERC earlier in its decision said that the very essence of an opportunity sale is that it's a sale for which the selling company takes sole responsibility. And we think that there's a conflict between the notion of taking sole responsibility and yet using some other company's energy. FERC relied on the language in 30.04, sales to others, right? Yes, FERC did rely on others. And it said that's the same language that appears in, what is it, 40.04? I believe it's 4.05 that your Honor might be referring to. I'm not sure though. And FERC said it's the same language there, and it's there that they authorized opportunity sales. Isn't that their reasoning? So, why isn't that, I mean, I realize you disagree with it, but why isn't that at least a reasonable interpretation there? Well, the main reason why it's unreasonable is because it runs into the problem that loads in 30.03A cannot support a distinction between requirement sales and opportunity sales. And in fact, FERC correctly started with 30.03A before turning to 30.04. We agree that that's the right order of analysis, but perhaps it would help. Let me try to give your Honor our interpretation of 30.04. We believe that 30.04 is best read and in fact must be read once the court does the 30.03A analysis, must be read to refer to a joint account sale. And there's another provision that I want to get to about 30.04, and I talked about reimbursement. 30.09 lists the type of payments that one company can make to another, and absent from that list is a payment to reimburse for energy supplied under 30.04. On the other hand, in a joint account sale, the payment is made by the system, by the group of companies and is received by the company that's furnishing the energy. So, the fact that there's no provision in 30.09, which provides an exhaustive list of the types of payments that one company can make to another, there's no mention of a 30.04 payment we think is instructive. We think FERC's interpretation creates a problem with that. And there's one other problem, which is that... Mr. Weisbrot, did you raise your 30.09 argument below before the commission? We did not use 30.09 in that specific way. We acknowledge that. However, we believe it's subsumed within our argument about the reimbursement concept on the one hand, and our argument, which I was about to get to, which is there's a whole service schedule called MSS-5 about how to allocate the margins from a joint account sale. And yet, there's no such service schedule on how to allocate margins from an opportunity sale. And we think that that's instructive because as the Louisiana Commission's own witness conceded at page 2028 of the appendix, there is no margin that's calculated for an opportunity sale. And therefore, it makes sense that you would have a service schedule that only applies to joint account sales and not for opportunity sales. And just to circle back to Judge Tatel's point, that is basically our interpretation of 30.04 in light of 4.05, is that it is discussing a joint account sale, not an opportunity sale. How important... I noticed in your brief, you cite two industry definitions of load, the U.S. Energy Information Administration and Edison Electric Institute. How important are those to your argument? I would say they're fairly important, but I think even more important is the contrast between 30.13 and 30.03a. So you say they're important. I have the same question Judge Rowell just asked you, whether you raise those two definitions in your petition for a hearing. So in our petition, to step back for a second, in opinion 521 at page 1401, FERC acknowledged that the industry definitions that I was referring to are generic and inclusive. That was in 521. Then in our rehearing petition, we argued specifically the point that Judge Rowell referred to before, which is about there's no textual basis for a distinction between requirement sale and opportunity sale. This is all part of how broad the word loads is. But even if the court were to conclude that we didn't preserve the industry definitions, which are in FERC's own decision, we certainly preserve the contrast between 30.13 and 30.03a, as well as the contrast between 70.06 and 30.03a. You're into your rebuttal time. Yes. If your honor will permit me to reserve the rest, I will. Thank you. Good morning. Carol Banta for the commission. I'll begin. To make a point with regard to the 30.09, as well as the industry definition, I would just, with the idea that an unraised argument was subsumed in another argument, I would just point to Judge Table's decision in Domtar, Maine from 2003, where this court made clear that if you're going to argue about a specific section, you don't get to argue that it was subsumed in an argument that you made. That was in a case where the commission actually conceded that the sections were closely related and the court still found it barred. I just wanted to point that out, but to pick up on Judge Table's question regarding section 4.05 and section 30.04. This really goes to the key part of the commission's analysis. Sales to others. If we're talking about things that aren't provided in various provisions of this agreement, there's no provision in this agreement that says anything about how to treat opportunity sales. In section 4.05, there is sales to others that distinguishes sales made for the sole responsibility of one company versus joint account sales. Interestingly, 30.04 echoes the sales to others, and the commission said sales to others is a 1833. The commission looked at 30.04 and saw in the commission's words, it mimics the language of section 4.05, which is the only basis in the main articles of the agreement that indicated that something like opportunity sales could be permissible. That was the ground for the commission finding them permissible, which the Louisiana Commission challenged on rehearing, but Entergy certainly did not, and nobody has challenged on appeal. I guess one of the questions I had is, so opportunity sales are wholesale sales, like requirement sales, which do fit within 30.03, but they're also sales to others under, or arguably sales to others under 30.04. I'm just wondering, why does FERC think that it is more natural to take the sales to other part of an opportunity sale, to put it under 30.04, as opposed to the similarities between other wholesale sales in 30.03? Because it seems like it has features of both. I don't really see in Opinion 521 a good explanation for why it should be in the 30.04 bucket as opposed to the 30.03 bucket. And I think, and one thing that really, I think, wasn't a big issue in this case is requirements contracts. There was a lot of discussion of native load and opportunity sales, so I don't have a lot I can point you to for requirements contracts. My understanding is, and I think this is reflected in, Entergy had a couple charts in its brief, and I'm thinking it showed the stack of how they wanted to allocate energy. Everyone seems to agree that something called native load is the lowest, gets the highest priority low cost. Native load is- Parties agree that requirement sales are within that load, within 30.03. I'm sorry. Right. It wasn't really challenged here. My understanding is that a requirement contract- I think the question- Excuse me. Sorry. The question is- Hello? Is- I'm sorry. Technical interference. I'm sorry. Yes. Are wholesale- I think what you're trying to get at is what's the difference between how are opportunity sales and wholesale requirement sales different, and are wholesale requirement sales part of the native load? I don't think they're part of the native load. I think they're often treated like native load, and it wasn't challenged here, and that's the distinction I was trying to make. Generally, native load is your retail rate payer. They're your end user customers. They're customers of Entergy, whatever, whichever state. Wholesale requirements contracts could be like a town that serves its retail customers but buys wholesale, but it pays- I think the distinction that was discussed at some point in the orders, and I may not have that marked. Wholesale requirements contracts, because they're long-term, they pay for both capacity and energy. They pay toward the fixed costs of the system. They, like retail rate payers, are paying for the generation that's built and the transmission and all the fixed costs. Opportunity sales, like joint account sales, are one-offs. Short-term, you think you have some extra, or you think you can make a buck on whatever you have, and in this case in particular, they were just energy sales. I think there's language in section 4.05 that joint account sales can be both capacity and energy, but these were just energy sales made short-term off the system to entities that were neither. Is there anything in the definition of loads that requires things that are included in the load to include both energy and capacity? Not in that definition, and that goes to the ambiguity, but this is a key point I wanted to bring up because central to the commission's analysis of this contract, and I think missing from Entergy's, is if we go to page, I had it written down, 1831 of the joint appendix. This is opinion 521A, paragraph 35. We emphasize this in our brief as well, and there are other places it's echoed, but I wanted to point to this. The commission said, Entergy ignores the commission's analysis of the system agreement and the distinction between sales made to native load and those sales made off system that is inherent within the system agreement itself. The commission was looking at the context of this very unusual, I don't know if there was another agreement like this anywhere, like the Entergy system agreement, where these different, the operating companies in different states, they served their customers in different states, but they cooperated to a great extent on planning, where to build generation, and so the whole thing in the contract and the reason for sections 30.03 and 30.04 is that there was a sharing of lower cost capacity, which as this court has noted several times, such as in the second decision from 2008, the one we called Louisiana 2008-Roman 2, which was where this issue previously came up and was dismissed because it was dicta and then this proceeding started. I think in that case, the court noted that there can be disparities in fuel cost in the Entergy system. In particular, Arkansas tends to have, I think, a fair amount of nuclear and a lot of coal and Louisiana would have more gas. So there were times in history when Louisiana's energy was cheaper than Arkansas's and vice versa. In this time period, Arkansas's was significantly cheaper. So the Entergy system agreement was set up so that these different operating companies working together would plan generation throughout the system and share access to the cheaper capacity to serve their baseloads. And that context, which suffuses the commission's analysis, I think is absent from Entergy's reading of it and that's what the commission... It seems as though that reading, though, seems inconsistent with what seems to be the practice in the Entergy system of allowing wholesale requirement sales, right, which was allowing companies to use that low-cost energy to serve other contracts outside the system. So I understand that that's not before us in particular. However, it is seemingly part of the practice within the Entergy system to allow such contracts. And I think that the answer is that those wholesale requirements contracts, like native load, contribute to the capacity costs and they're sharing the cost of the system. And the only one place I can point to, although it's on a different issue, on JA1404, which is in opinion 521 and it's footnote 251, and it's actually a scope holding saying there's something we're not going to look into here, but it was the question of whether Entergy Arkansas had making sure that its requirements customers were paying their share, whether it was passing those through appropriately. So that's an indication that the way wholesale requirements contracts are billed I think is similar to the way that native load is, whereas opportunity sales are just taking the one-off sale of energy without contributing to the cost of the system. And the commission is saying that the parties, particularly the native load, and I think for these purposes, requirements contracts are in the same position. The parties that have paid to build this system get the benefit of being served by the more efficient, lower cost capacity that they've contributed to, and that that is the context of this very unusual system agreement, which the commission found important in trying to understand an ambiguous term in 30.03. And again, I would come back to the echoed language in 30.04 to 4.05, which again, this whole agreement. The commission also talks in its opinion not just about the purpose of sharing energy, but also about the idea that the system agreement allows the companies to maintain their own needs. So the system agreement doesn't just have a single purpose to share energy. It also importantly leaves some of the control over the generation and use of energy to the individual companies. So it doesn't seem to me like the general purpose can necessarily dictate how these costs should be allocated for the opportunity sales. Contract interpretation generally, right? We looked at the specific controls, any general language, I would think. Well, the commission found that two others, because it's only used in 4.05 and 30.04. So the commission actually thought that sales to others was specific language, but I would point also to paragraph 43 of opinion 521A, and this is at JA 1835, where the commission said that the commission is trying to balance, it believes that it's holding here, strikes the correct balance between the rights of the individual operating companies to make opportunity sales for their own account and the rights of the system as a whole. And it makes a reference elsewhere, I believe in 548, I don't know if I can put my hands on it right away, to the ability of the highest priority customers throughout the system having access to the cheaper energy. So the balance here is, does Entergy Arkansas get to sell all of its cheap energy to whoever it wants, or does it have obligations under the system agreement to allocate it? Yes, first to its retail customers and its wholesale requirements customers. Those aren't at issue here. The question is, what comes next? Is it the pool selling it to the other companies under 30.03B, or are these sales to others, like joint account sales, with the difference being that the revenues just go to the company itself and not divided up for the joint account, which is the difference between the joint account and the opportunity sales. So Ms. Banta, maybe let me ask you the reverse of a question that about reasonableness. So do we have, I mean, does FERC lose if we find the contract unambiguous? I guess what's your best argument for, you know, like a plain reading that supports FERC at step one in Chevron? Well, I mean, the commission said there was no plain reading. I suppose my best argument would be the mirrored language between 4.05 and 30.04. And again, there's no language in the agreement that says how opportunity sales should be treated. All we have even to permit them in section 4.05 is the implication in the negative, that joint account sales are for when you don't want to sell for yourself. Just a note on the from net area requirements in the bandwidth formula in section 30.13, which was added in 2006. So it was actually after many of these sales had occurred. And that doesn't use the word loads at all. That's about requirements. So I don't think that helps here. So, and the commission said the allocation provisions in the MSS schedule don't tell you what's allowed under the agreement. So the commission had to find the permission under 4.05 anyway. But apart from all that, the commission, I mean, the core of its finding here was that there wasn't an unambiguous reading. And the most important part for that is paragraph, I think it's I-21 at paragraph 128 on JA-1401. The commission's looking at the word load. On the one hand, it's looking at the word sales to others. On the other hand, it has substantial evidence in the record. It's disputed, but it has substantial evidence in the record, including testimony from staff witness stamina that we cited in our brief and it cited in the order that loads and requirements are used in a number of different ways throughout the agreement. And there isn't a clear meaning there. Now, the commission also said at the end of that paragraph that Louisiana has not demonstrated that load and requirements must refer exclusively to native load. The commission says we are not convinced that that's a plain reading that we must follow, but that is an alternative reading. So those are the alternative readings in play here. Either loads means everything and Arkansas can allocate its cheapest energy to everyone that it sells to and we're going to imply the term joint accounts in 30.04 where it isn't. That's one reading. Another reading is that 30.03 necessarily means native load. Well, the commission didn't make that finding, but it said that is another reading. We don't find it to be a plain reading. So the commission's decision here was very much based on ambiguity, but it is rooted in both the terms, the mirrored language in those two provisions, and always looking to the overall context of the agreement. On the opinion, there was... What weight or significance of any is there to the fact that if we adopted the commission's interpretation, these opportunity sales would always lose money or would almost always lose money? I don't think there's... I'm sorry. And just, I guess, the absurdity argument that's raised. Well, first, I would note, as we did in our brief, that there was no absurdity argument with regard to the contract interpretation raised below. The only place I could find energy ever use the word absurd was with reference to disputing the refunds that the commission determined. That aside, I don't think there's evidence in this record that they would always lose money. They certainly... Why make any difference? Let's assume it's right that they would always lose money. What difference does that make? As you just explained, the purpose of this agreement, the companies agreed to basically prioritize their own customers, right? Yeah. They would get the lowest cost energy. And if the only way for them to benefit from the lowest cost energy is not to sell to non-customers, isn't that just a natural consequence of the agreement? Yes. Yes, you're absolutely right. And I think there's some evidence in this record that because Arkansas was... Is that... Oh, okay. I'm sorry. No, I think that's right. The commission said, you can make these sales and they made some... They may not have made enough to cover their costs. Maybe they've made more than if they hadn't sold any. But the commission says, you want full responsibility? It doesn't mean you get to keep the cheapest energy away from the other members of the system. It does mean that you own the margins, positive and negative. All right. Okay. Well, thank you. Thank you. Yeah. We'll hear from Mr. Louisiana. Yes, Your Honor. Mike Fontham, representing the Louisiana Public Service Commission. I would like to address Judge Rao's question and Judge Wilkins. And then if I have time, I'll move to the jurisdiction. Judge Rao, there is a tremendous difference between opportunity sales and wholesale requirement sales. Wholesale requirement sales are part of native load. Native load is defined as the retail and customers served under a long-term wholesale commitment. Customers served under a wholesale long-term commitment are customers like the customers of a city in North Little Rock that buys all its requirements from Energy Arkansas. Those requirements customers, just like native load customers, pay for the capacity. And so, therefore, they are entitled to the cheap energy that comes from that capacity. Opportunity sales are these what are supposed to be short-term, like day ahead, sales where the retail jurisdiction, those revenues go to customers to offset their cost of the capacity. What Energy did in this case is it pretended that those sales were being made to a wholesale requirements customer so that it could keep the revenue instead of crediting the revenue. And it even filed fuel reports at FERC and in Arkansas saying that these sales were made in Arkansas, they said, to customer number 13, which was a fictitious wholesale requirements customer. And in FERC, it was just must end with the energy for wholesale requirements customers. So that the fundamental issue arises, and that's the issue in this case, more than all this stuff about what one company can do and what another company can do. The shareholders managed to take all the revenues and they managed to put the cost on the consumers. They avoided the cost. These were, Judge Wilkins, these were losing propositions from the start. They never would have been made except Energy thought they could put the cost on the consumers and keep the money for the shareholders. So they falsely reported, this is a wholesale requirements customer, it's not an opportunity sale. But it was an opportunity sale. So there's a tremendous difference there. And this is universal, Judge. Everywhere you make an opportunity sale, the revenues go to the customers. It's not something that's unique to Energy, not anything that's unusual, it's everywhere. But if you're willing to go to some extremes to keep the money yourself for shareholders, then you don't credit the revenues. And what Energy has always done with joint account sales is they make the sale, if there's a positive margin, they give it to everybody. And if there's a negative margin, they give that to everybody too. But usually those don't happen because they don't make sales that are going to be losing. All right, Mr. Fathom, you're over time. Did you have a second point you want to make that you can make quickly because you're over time? Well, Your Honor, with regard to what you brought up, you can do a word search in that request for rehearing for Edison Electric Institute, Energy Information Agency, industry definition, technical definition, you will not find anything. Okay. They never argued that at any point in phase one, never. Thank you. Mr. Weisberg. Yes, thank you, Judge Tatel. I'd like to start with, again, going back to the most important point in our view in this case, the contrast. Dan, how much time does he have left? Counsel had no time remaining, but he had initially reserved six minutes for rebuttal. Oh, well, you can take two minutes then. Go ahead. I thought you hadn't used up your time, but go ahead. So to be clear, how much time do I have? I'm sorry. I'll just, I'll start. I have very little time. Joint Appendix 1397. I did not hear Ms. Banta address that point. It's FERC's, and it's important, FERC's decision. Which point? The 30.13 versus 30.03a point. I did not hear Ms. Banta address page 1397, which is part of FERC's decision, opinion 521, where FERC says that 30.03a allocates based on total loads. It says that in explicit reference and contrast to 30.13, which again, has a carve out of opportunity sales. Ms. Banta also said that the words in 30.13 are net area requirements. She said that has nothing to do with load. At reply brief six, note five, we explained that FERC itself equated those terms. I'd like to address the point about opportunity sales, not contribute, the customers don't contribute anything to the fixed cost. We disagree with that point. And I'd refer the court to Joint Appendix 413. Whenever the revenues from an opportunity sale exceed the fuel costs, that excess is available to help pay for fixed costs. And I think the North Little Rock example, which was referred to by Mr. Fontham, I believe, illustrates this. So North Little Rock was a wholesale requirements customer. No dispute that wholesale requirements customers are within under 30.03a. Once that contract ended, the same exact amount of energy was sold as an opportunity sale. This wasn't taking it away from the other companies or their customers. This was the energy that wasn't going to those companies initially. And now because of the loss of North Little Rock as a customer, it was being sold to an opportunity sales customer. And the excess, if any, above the fixed cost of that plant. So we disagree with that. But I want to come back to the most important thing, which is a lot of what we've heard from Ms. Banta, from Mr. Fontham, is about reasonableness. It's about policy. Our main submission in this case, in addition to the absurdity point, but our main position is the plain language, the contrast between those provisions, Chevron step one. And I think of the cases we cited, although it goes a ways back, the consolidated Edison case that Judge Tatel sat on is a case that I think shows that even where the agency and FERC in that case is being reasonable, if the plain language precludes what FERC has done, the agency has to lose. And that is our submission in this case. If the court has no further questions, I'll rest on my briefs. Thank you very much. Thank you. Okay. It's Mike Fontham again, Your Honor, for the LPSC, I believe. Is that right? I got a message to unmute. Yes, you are. Okay. Thank you very much. You're going to talk about burden of proof? Yes, Your Honor. I'm going to talk about burden of proof and the offsets. The offsets, right. Okay. Go ahead. Okay. And I want to reiterate, this is fundamentally a case involving shareholders versus consumers. And to the point just made by Mr. Weisburst, none of these opportunity sales margins, if they were positive, which was rare, were credited to the customers. Energy kept them all. And FERC found that $202 million while they imposed about $280 million on the customers as the cost. And they were happy with that absurd proposition. But once FERC says, no, no, you have to absorb the actual cost, which is the actual cost of the sales. Well, they're not so happy with it. The customers should have to pay that. That's their position. And with regard to burden of proof, our complaint alleged that they were doing something that they couldn't do under the system agreement. And by the fact, the actual fact is they had never done it. And they had had a policy that they won't do it. And they had said over and over and over again, that our capacity is available for the native load. And we've cited all of that. It's in our briefs. They said it at FERC. They said it at the LPSC. They said it in their form ones. They said it in... You were going to talk about the burden of proof, weren't you? I am, your honor. And I'm... Is this a lead up? It's a lead up. It's a... Your honor, it's an attempt to... Okay. ...reimpose the big picture, as opposed to all this technical stuff. Let me just ask you the big picture question about burden of proof. And you can tell me why you think this is wrong. I mean, what I see here is you and FERC just have different views about what happened here. FERC says, Louisiana began the proceeding, so it has the burden of proof on both liability and damages. You have a different view about that. And, you know, our case law says that FERC's discretion at this remedial stage is at its zenith. What possible basis can you give us for second guessing FERC's judgment? I mean, I realize you disagree with it, and I might even disagree with it. But given that this is a highly discretionary decision, how can we possibly second guess it? Well, because their precedent says that if you take the burden, you go first and last. You can't turn around and say somebody else had the burden. That's in the Northwestern case that we cited. And this court has said it in two or three cases that we cited, that the party proposing offsets. And that is what happened in this case. Energy asked for the right to propose offsets. This was after the damages were basically done. The damages, everyone has agreed, we're going to rerun the ISB intrasystem bill, energy reallocation. Energy had proposed that. We said, okay. Damages was done. And that's under service schedule MSS3. Energy then says, well, we'd like to propose some adjustments to service schedule MSS1 and the bandwidth tariff. Bandwidth tariff is a totally separate tariff. It doesn't deal with the ISB at all. And so we said, then energy says, okay, here's the procedural schedule. We go first, we go last. Our view is that this is all part of putting the system back to where it would have been if the opportunity costs had been charged correctly. It all goes back to that. Well, it does go back to that. And as my opponent said over and over again, they never would have been made. Excuse me. All of these adjustments that FERC has made or not made are in service of that proposition. Isn't that true? No. Energy put the load into Arkansas' load. And as a result of that, the shareholders are really – they imposed it on customers in Arkansas. But there was an opportunity to change that. And that's what we were doing. It wasn't part of the initial damage calculation at all. And with regard to the bandwidth, FERC had ruled and the Fifth Circuit ruled you can't make out-of-period adjustments to the bandwidth. And FERC acknowledged that. So that was the law. So FERC says, well, yeah, but we're just going to adjust damages for the bandwidth. Well, how in the world do we have the responsibility to anticipate an argument like that and then attack it when we don't even know what the argument is? So we went second. We responded to Energy's arguments. And we – they got to go last on the staff witness. They accepted all that. And then they turned around and changed their mind. So, Your Honor, these are offsets. This is not part of the initial damage calculation. It's two separate service schedules. And like as an example in the case of the bandwidth. Your Honor, the bandwidth adjustment that they made caused everybody to have to pay Energy Arkansas money. The damages that was returned, $8.3 million. The bandwidth adjustment, $13.8 million. All the bandwidth adjustment did was just reduce the damages. It just reduced the damages. No, no. That's not – Arkansas – it didn't require the other companies to – here, I'm quoting for you, quote, pay Energy Arkansas for the excess bandwidth. It was just – it was – they were putting the system back to where it would have been. Well, Your Honor, I – Louisiana disagrees with that. I'm sorry. Because – well, we – that's not what happened. I mean, the fact is that there were damages for the pre-bandwidth period. Okay? And those damages were higher than the damages that got awarded. For the bandwidth period, which was 2005 to 2009, the only thing at issue in phase three was the bandwidth period. And in the bandwidth period, FERC made the other companies pay Arkansas, which had the effect of reducing the damages awarded for 2000 to 2004. It is not just a reduction – Mr. Fawcett? It's not a reduction of the damages for the bandwidth period. To Fawcett? Maybe on Judge Tatel's questions, I mean, it seems most of your arguments are pushing in the direction of an assumption – like, putting the companies back to where they would be if opportunity sales never happened. But we are in a world where FERC has said they are okay. I believe you're not challenging whether opportunity sales were permissible in this appeal or in this petition. So, I'm just not sure how your arguments fit within the framework of an interpretation of a system agreement that allows for opportunity sales. The arguments about the offsets? Yeah. Because it seems like your arguments are really trying to push back to a circumstance in which opportunity sales never existed. Well, and that's exactly right, because that measures the difference in the bandwidth that was made by the opportunity sales. In other words, FERC said in 548A – 548A, and it's on page 1988 of the appendix – FERC says, we were asking for rehearing. They said, well, Louisiana seems to assume that we ordered putting the refunds into the bandwidth. We didn't order that. We ordered avoiding duplicative damages. Well, if you want to remove duplicative damages, you remove the revenues. The revenues were much lower than the cost that the other companies pay. So, if you incur a $10 cost and the revenues are 6, I credit you 6, okay? And then later on, FERC says, okay, there was a violation. I have to pay you 10, but we're going to take the 10 and put it in the bandwidth, and it's going to go right back to you. So, you're still out four. It went beyond duplicative damages. There's no evidence in the record to support that it only fixed the duplicative damages. None. Now, if all the refunds, all the extra costs had originally been included in Arkansas's costs, yes, that's what they accomplished. But as everybody agrees, the sales never would have been made under that circumstance. So, you know, the ratepayers wind up for the bandwidth period. I agree. The ratepayers wind up paying Arkansas. How can that make any sense for violating the system agreement? And the same thing is true with regard to the responsibility ratio allocation. It is proven. The judge made all kinds of findings that these sales, because they were made a month ahead as opposed to next day, energy never made sales a month ahead because it didn't have the resources to serve them. It had to buy to serve a sale from a month ahead standpoint. Day ahead, they knew they had the resource. So, they make the sales a month ahead. They buy capacity to support the sales. They're buying and putting the cost on consumers and selling and keeping the revenue for shareholders. Can I just... And the judge said, well, you have to pay the capacity cost too. Let me just go back to basics with you about this. So... Okay. Okay. Tell me if this is wrong. Energy Arkansas, by misallocating the opportunity costs, that is by treating them as O3 rather than O4, by doing that, it paid more... Excuse me. Energy Arkansas paid more in bandwidth payments than it otherwise would have, correct? Correct. No, it's because in the bandwidth... Wait, wait. ...in the bandwidth, that's not why. It's not right? No, sir. Okay. Tell me why. Well, in the bandwidth, there's two ways you can deal with these sales. You could have them take responsibility for the sales in the energy ratio. The energy ratio was not changed. So, they took no responsibility for the sales. So, they bore none of the costs. What they did was, is they credited the revenues, even though the revenues are going to shareholders, they credited the revenues. And so, Energy Arkansas paid other companies an amount equivalent to the revenues, in my example, the $6. But the cost of the sale was $10, in my example, $10. So, they only gave back the revenue credit. And this was a matter in Opinion 505, we were fighting that. We were saying, wait a minute, they need to take responsibility for the sales. And FERC said, no, no, revenue credit's okay. Okay. So, that's not why on the bandwidth. I understand. Okay, thank you. You're out of time. Let's hear from the commission on this issue, okay? Ms. Bannon, could you speak to this issue? I'm sorry, which issue? Council said that, when I said that Energy Arkansas, by NIF allocating the opportunity sales, paid more in bandwidth payments than it should have, than it would have, that what FERC has essentially done is, in other words, the operating companies got more than they should have, if these had been properly allocated. Now that they've been properly allocated, they've got to pay it back. Is that wrong? No, that is absolutely right. Okay. That is exactly... And I think it goes, as we said in our brief, and as the commission said... Why is he... Did you understand his argument to explain why I was wrong? Somewhat. But Louisiana's position throughout has been that the bandwidth needs to be calculated as though the sales were never made. Right. And that I understood. I get that. And all adjustments are to get us back to that point, right? Except that the commission said the adjustments are to get us to... Because the commission said the sales were authorized. Right, correct. The commission said, we need to get us back... Although getting back, it's a bit artificial, the commission... It would be, if these had been properly allocated under O3, correct? Precisely. And the commission said, we're trying to recreate a scenario that admittedly didn't happen. They weren't allocated correctly. And there is an argument that some of these sales wouldn't have been made, but the milk is spilled. And the commission is just trying to... And says several times, this is necessarily going to be difficult because we're trying to recreate circumstances that did not exist. But the goals throughout, yes, was what would the picture have looked like if the allocation had... If the sales were made because they were permitted, but they were allocated correctly? Okay. In response to the original argument of that burden of proof. Yes. And your questions were exactly right. The commission looked at this. We're not setting a damage calculation. What are the damages resulting from the misallocation? Not the sales being made from the misallocation. So the first thing we do is the methodology the commission approved was rerunning the interest system bill to determine if all the energy had been allocated appropriately. But because of the impact in the bandwidth formula, the commission determined that the other operating companies may have already benefited from the mistake because Arkansas was reporting these sales at the cheapest energy costs. So it had a lower production cost and its production cost being lower than the system average is that it had to pay bandwidth payments to the other companies and precisely the measure by which it made those bandwidth payments. So the commission said, if we're calculating the damages done here, which are X, what do we do to make sure we don't have duplicate amounts that are windfalls? Because we're requiring damages to be paid for damages that weren't offset in the sense of an affirmative defense. It's not where you determine damages for some contract breach, but then you can back off some of it because there was mitigation. It is the initial damages calculation. And the commission said that in a couple of places in paragraph 548 in opinion, 548 paragraph 148 and in 548A at paragraph 10 and 23. And I wanted to point in particular to, actually I'm jumping ahead to opinion 565A paragraph 11 on JA 2444, where the commission says that the Louisiana commission's arguments here in phase three continue to reflect the misunderstanding of the commission's holdings in opinion 521. Louisiana is still fighting phase one. Louisiana is still wanting the calculation to be done as though the sales were never made because it believed from the start that the sales were unauthorized. That's done. That's phase one. That's done. The commission said, and it's not before the court on appeal, the commission said these sales are authorized. So what do we do with that? We found the breach in the misallocation. All the damages and all the calculations are oriented toward recreating the scenario that would have been, had the sales been made, but allocated properly. And I think, and looking at the court's questions, I think Judge Rao had said you see that Louisiana seems to be pushing for a scenario where the opportunity sales never existed. And that's precisely right. That's precisely what the commission said and why it wants to point out that while there was some netting to avoid duplicate damages in the bandwidth calculations, no company had to pay Entergy Arkansas. The commission made clear in numerous places, the damages calculation is for the entire period that was found to have been misallocated, which is from I think late 2000 to 2009. The bandwidth remedy comes into effect in June, 2005. There's evidence in the record that the commission cited that the bulk of these sales and the bulk of the dollars amounts from these sales occurred between 2002 and 2005, maybe 2006. So most of them are completely unaffected by the bandwidth adjustment at all. And as, and we had the numbers in our brief in the compliance filing, all of the other no one had to cut a check to Entergy Arkansas. So in a few of the bandwidth years, it did turn out that some companies had benefited more from the reallocation from the misallocation than they had suffered from the misallocation. So there was some netting, but because the commission was looking at the damages for the entire decade and the bulk of the damages predate the bandwidth remedy, the net amounts were still substantial refunds to all the companies. And the commission had made clear from I believe opinion 521 that Entergy Arkansas would be paying refunds to the other companies. No one would be paying Entergy Arkansas. And it was that way from the start and it was that way at the end. Unless the court has any. Judge Wilkins, I have no other questions. Either of you. Okay. Thank you. Did you use up and how much time does he have left? Yeah, go ahead. And would you at least use part of your three minutes to respond to the two points Ms. Panta just made about the burden of proof and about the bandwidth? Your Honor, with regard to the bandwidth, let me go with that first. Sure. The bandwidth remedy FERC chose was to put the refunds into Arkansas's costs and the bandwidth. This is to get back to the position if they have been allocated correctly. In opinion 548A, we asked for rehearing of the bandwidth decision. And in note 48, on page 1988 of the appendix, FERC says, the Louisiana commission appears to assume that the commission found that the refunds ordered in this proceeding should be included in revised bandwidth formula inputs. That assumption is incorrect. The commission instead required that the determination should be made as to whether any overpayments were made under the overpayments were made as a result. Isn't that last sentence you read exactly what happened? No, because the overpayments were not the overpayments were not made as a result of the incorrect accounting. That's because of opinion 505. And we cited it in the brief opinion 505 says, don't include the costs, which is the incorrect allocation, include the revenues. That's what they did. They only included the revenues. To reverse that, you can only take out the revenues. That's the whole issue about negative margins. The difference between the revenues and the total cost. It is incorrect to say that the incorrect allocation caused this result. It did not. And we proved that. And there's no contrary evidence. Now, on the burden, your honor, what point was it you wanted me to address there? Well, you heard what Ms. Banta said. She, she, she, well, I think we're going over, over plowed ground here. Do you have anything more you want to say about the burden of proof? I just want to say, your honor, in 548A, in this note, they recognize it's not the same thing to include the refunds in the bandwidth, which is what ultimately happened and get rid of the overpayments. They recognize that they said, you're wrong. We didn't order that. And then they wind up doing it. Okay. I agree that we agree that they should get rid of damages. Okay. We, we take, we've got your argument. The third segment of this case. Okay. Then we'll hear from Mr. Lane, I think. Is that correct? I think so, your honor. Okay. So I just want to get that back since my argument will be about the bandwidth payments. I would just like to refer you, particularly Judge Tatel, to JA 2177. It's actually a carryover paragraph. It's paragraph 76 of the commission's opinion 565. And it says that what they are doing is making sure the other operating, entity operating companies don't get a windfall from the excess bandwidth payments. So. Okay. Mr. Lane, I think you're muted. Anyway, did you get my JA reference 21? Yeah. You, you, do I understand you agree with Ms. Banta on this point, correct? I agree with Ms. Banta on this point. You just gave me the citation, right? Okay. Where we disagree is that the question. So what the commission did was come up with a simple remedy, but the question is, did that remedy to get the other, if you don't mind, I'll call them the ELCs, energy operating companies, just to save words. It's helpful to have the words. I'll give you 10 seconds if you use the words. Thank you. Okay. So to put it in your words, Judge Tatel, to put the other, the energy, other energy operating companies in the same position they would have been without a misallocation, is that just, there's a simple, the commission picked a simple remedy, but did that abandon cost causation principles and therefore it's arbitrary and capricious. There are two groups that were burdened by the misallocation under the commission's ruling. The other energy operating companies obviously paid the higher energy costs, but the excess bandwidth payments, everyone agrees, were paid by Arkansas retail rate payers. Our position at the commission was that the commission, instead of, so what the commission did was take a simple remedy. They said, okay, all you energy operating companies, you're getting damages from the lower energy costs that you should have paid had the, had the, these opportunity sales not been misallocated. But what we're going to do is so you'll see in the opinions that there was $81 million of damages and they deducted 13.7 from that for the excess bandwidth payments. So in effect, Entergy Arkansas paid $67 million. As I understand it, FERC just decided, FERC didn't address this issue, correct? It said it's outside the scope of these proceedings, correct? Correct. That's what they said. Right. But you know, you're arguing this before an appeals court and we aren't FERC and we defer deeply to FERC on questions like this, on its decisions and judgments regarding the scope of its own hearings. And I didn't see anything in your brief that gave us a basis for taking the very unusual step of second guessing that judgment. Can you give us one? Yes, sure. So, yes. So the commission said it's outside the scope of the hearing. Right. But in fact, it was used as an offset. So that's within the scope of the hearing. They determined in the hearing that the excess bandwidth payments equaled $13.7 million. So they figured that out. Yes, the commission said we're not asking you to recalculate the bandwidth payments. But in fact, they determined what the excess payments were. They deducted that from the damages amount. So it was in the proceeding. We don't understand. Our view is it wasn't outside the scope of the proceeding. It was in the proceeding. And what FERC should have done was just put that money, basically put it aside and not. I see. So you're saying that FERC, in fact, actually decided this issue, right? That's your position. Yes. And they did decide it. They said it was $13.7 million is the amount of the excess payments. And they deducted it. And if you look through our reply brief, we discussed this extensively. Well, not extensively. Mr. Lane, the standard here for us reviewing FERC's manner of proceeding is abuse of discretion. Isn't that the standard that we have to use? I would. We argued it would be arbitrary and capricious, Your Honor. But I don't know if we're dancing on the heads of pins. I mean, would your client, I mean, are you prejudiced by the fact that FERC may not decide this? I mean, don't you have an alternative forum to pursue these claims in federal district court? Well, the answer is the Arkansas Commission has decided it. And we decided that the retail rate payers should not pay for it. Now, Entergy Arkansas has taken us to federal district court appealing that state court decision in Argonne. Basically, their argument is the FERC decision preempted us from taking that action. So yes, we are affected. We remain affected by FERC's decision. And to answer your question, yes, we think it was an abuse of discretion. It was arbitrary and capricious not to consider that that money was paid by retail rate payers. And it should have gone back to them rather than being used as an offset to the damages that were to be paid by shareholders. Mr. Lane, would then FERC, I mean, under your view, would FERC have to decide that question with respect to shareholders and rate payers of the other operating companies? No. No, Judge Rao. To the extent that they were receiving a refund? No. We don't think... We agree with FERC completely that the question of whether these money should go to rate payers or shareholders is a retail rate question and should be decided in this case by Arkansas Public Service Commission. But what we're saying is it was arbitrary and capricious in just looking at from a wholesale rate point of view to deduct that amount from the damages rather than... Basically, we said it should be credited to the rate payers. The shareholders never paid for that. Shareholders did not pay that excess. The rate payers did. But the effect of using that offset was to give that money to the shareholders. Okay. Okay. So, do you have anything else? Because otherwise, we'll hear from Ms. Banta. I'll reserve my time. Ms. Banta, do you want to... And could you just respond directly to this argument? He says that the commission, in effect, did decide... Mr. Lane says the commission, in effect, did decide this question with this $13 million amount. Right? Right. And what's the answer to that? The answer is that the commission went out of its way. And I would point in particular... I mean, in addition to the numerous places where the commission said this is outside the scope, I would point to paragraphs 11 and 12 of Order 548A on JA 1982-1983. The commission went beyond saying this is outside... The distribution of damages between rate payers and shareholders is outside the scope. The commission has made no findings as to how this should be treated for purposes of retail rates. And the commission said twice with regard to the bandwidth reductions and the responsibility ratio reallocations, I think. Nothing in Opinion 548 prevents the Arkansas Commission from pursuing the flowback of the results in an appropriate form. That was getting to my question. So, if it had picked up on that sentence, what would it have done? What should it have done? Should who? Arkansas. I'm sorry. Mr. Lane, what should they have done? Well, I... Did you say pursue? Was that the language you just read me? Yes. Pursuing... The language is slightly different as between paragraphs 11 and 12, but pursuing the issue of flow through. I mean, the commission... I'm sorry. I'm sorry. I didn't mean to interrupt you, but I just want to know what should have been their next step? Well, the commission left open what the appropriate forum could be, but of course, the Arkansas Commission is itself a state regulator. And my understanding is they did take action. That would be one forum, as your honor noted, federal district court, I suppose, could be. The commission didn't even limit what an appropriate forum could be, just that this wasn't it. Okay. The commission focused on the allocation among the operating companies because it was focusing on the system agreement. It said several times that the goal was to put the operating companies in the position they would have been if the reallocation or if the allocation had been proper. And that the commission's remedy or consideration was limited to allocation of costs among the operating companies, not allocation among classes of customers. They left that open and it went out of its way not to say something that would be preemptive or preclude someone from making an argument. And I would note that in the district court litigation, which the commission has not been involved in, and as far as I know, has not spoken to it in an order or anything, but because it was put in front of this court in a letter, I would note that the commission seems to agree because the commission's repeated emphasis that it was not deciding retail treatment and that that should be relevant to the preemptive effect of these orders because that's exactly the argument that Arkansas has made in moving to dismiss. Ms. Banta, it's not FERC's position that they have exclusive jurisdiction over this, I'm assuming, because they said they're making no findings and it's outside the scope of the proceeding. That's right. I think in the appropriate case, there is case law that if the commission sets a rate or sets a wholesale allocation, that does, by virtue of case law, have a preemptive effect on state regulators. But here, it's a damages calculation for a filed rate violation and the commission allocated among, it would not be open for one of the state regulators to decide that the damages should have been allocated differently and that one state really should have gotten more than the other. That would be precluded by the commission's determination here. But as to how the damages paid or received residing with any one of the operating companies should be treated by that company's retail regulator or regulators, the commission expressly disavowed in pretty categorical language. So, I think that the commission went pretty far. So, FERC's view is that that excluded issue is more like an issue involving retail regulation, right? The question of whether you can have the pass-through to the regulator. Yeah. Right. Because it is a question here within Entergy Arkansas. Entergy Arkansas had to pay a certain amount. Those damages were netted out by a certain amount. How that will or should affect Arkansas's retail rate payers is not something the commission was deciding here. And again, had it set a rate in this case, I do think under the case law, you know, that Nantahala and Mississippi and I think Entergy Louisiana, then it does bind the hands of the state regulators to some degree. But this, again, and the commission said in Section 206, the commission did not set a rate. It didn't change the system agreement at all. It said there was a violation of the system agreement and damages are appropriate for it. The commission didn't go into all that. It was much simpler. This is outside the scope, and we're not saying anything that prevents you from doing this in another form. Thank you. If the commission has no further questions, I'll give back my time then. Judge Wilkins. Okay. Well, thank you. Thank you. Ms. Jolaine, I think you had two minutes. Thank you, Judge Stadel. Just to answer your question, Judge Stadel, we had two options about what we could do about the commission's order. Under the FPA, we can only appeal it to you. So we did appeal it to you. And Entergy Arkansas came to the Arkansas Commission with a retail rate filing requesting that it recover not only the excess bandwidth damages, but the entire amount of the damages. And we, and I say we, the Arkansas Commission. Agreed, right? Right? No, it didn't agree with Entergy Arkansas. It agreed that the retail rate payers should, that Entergy Arkansas should refund the $13.7 million in excess bandwidth, and that the retail rate payers are not liable for the damages. But isn't that exactly what the commission contemplated would happen? I think the question, I say this is just a question, this is just a retail question. It's not something we're going to decide. I mean, I think Ms. Bamford quoted from the decision. Yes, I agree. That's, but we didn't raise this as a retail rate question. We raised this as a and what we were saying that all the damages should have been paid by the shareholders. There should have been no offset for the excess bandwidth payments, which were paid by retail rate payers. That's what we're saying is wrong with the commission's decision. Not that we didn't have other options. We had other options. We've taken them. We're in district court now fighting with Entergy Arkansas about the state retail rate decision. So yes, we did what the commission said, but we don't think that makes what the commission did right. Well, thank you. We have your argument. Thank you all for your arguments this morning. The case is submitted.
judges: Tatel, Wilkins, Rao